**DIAMOND MINI MARKET, Petitioner**

v.

**DEPARTMENT OF HEALTH, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 8, 2013.

Decided Nov. 7, 2013.

Paul J. Winterhalter, Philadelphia, for petitioner.

Puja Khare, Assistant Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, Judge, SIMPSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge LEADBETTER.

Diamond Mini Mart (Diamond or the Store) appeals from the order of the Department of Health's Chief Hearing Officer affirming the Department's decision to disqualify Diamond from participation in the Supplemental Nutrition Program for Women, Infants and Children (WIC Program or Program) for three years.[1] The three year disqualification was based upon credited evidence that Diamond overcharged the WIC Program on three separate occasions during a compliance investigation. On appeal, Diamond argues, in a somewhat confounding manner, that a disqualification from the Program based upon the commission of separate overcharges on three different occasions during the same compliance investigation is contrary to the applicable regulations. In addition, Diamond argues that disqualification is not a mandatory sanction and, in this case, represents an abuse of discretion.

The WIC Program serves to provide allowable foods to income eligible pregnant, breast-feeding or postpartum women, infants and children up to 5 years of age, who are at nutritional risk because of medical problems or poor diets. The WIC Program provides these individuals with nutritious foods to supplement their diets during critical stages of growth and development. 28 Pa.Code § 1101.1(a)(1). The Program is funded through the United States Department of Agriculture (USDA) and provides cash grants to State agencies to administer the Program through local agencies. *See generally* 7 C.F.R. § 246.1; 28 Pa.Code § 1101.1(a). In Pennsylvania, the Department of Health (Department) is responsible for developing policies and procedures pertaining to Program administration, including, *inter alia,* authorizing store participation in the Program, monitoring and evaluating Program services provided by authorized stores and otherwise carrying out the duties delegated by the USDA.[2] 28 Pa. Code § 1101.3(a). The Department's Program Integrity Unit monitors WIC-authorized stores for compliance with WIC regulations. Compliance monitoring is accomplished through different methods, including compliance investigations, which entail a "series of at least two compliance buys conducted at the same WIC authorized store." *Id.* § 1101.2. *See also* 28 Pa.Code § 1105.6(b)(1). A "compliance buy" is a "covert purchase at a WIC authorized store, with a WIC check, conducted to enable the Department to evaluate adherence by a WIC authorized store with [applicable regulations] gov-

---

1. The Department of Health's Program Integrity Unit, Division of Women, Infants and Children, initially disqualified Diamond from participating in the program.

2. A "WIC authorized store" is a retail food store, which has demonstrated in an application process that it satisfies certain regulatory criteria, and is authorized to provide allowable foods to participants by accepting WIC checks. *See* 28 Pa.Code § 1101.2 (definitions) and Chapters 1103 (authorization of stores) and 1105 (WIC store requirements).

erning the store's participation in the WIC Program." *Id.* § 1101.2. In general, the Department provides written notification to the WIC authorized store of the results of each compliance buy, including any violations of the statutory or regulatory authority governing the store's participation in the Program. *Id.* § 1105.6(b)(3).

A compliance investigation of a WIC-authorized store is closed if no violations are discovered after two consecutive compliance buys. *Id.* § 1105.6(b)(7). Notably, the Department considers that each visit to an authorized store during the course of a compliance investigation to be a separate compliance buy. If an overcharge violation occurs during a compliance buy, the Department considers that specific compliance buy to be one overcharge incident. *See* Notes of Testimony at 47 (Hearing of October 9, 2012).

Prior to disqualification, Diamond was an authorized WIC store located in Philadelphia. Diamond was the subject of a compliance investigation.[3] Consequently, four separate compliance buys occurred at the Store. While it is not necessary to review the specific details of each compliance buy, suffice it to say that although no overcharges occurred during the first compliance buy in August 2010, violations were detected, causing the Department to direct the local agency to conduct another compliance buy at the Store. The second compliance buy in March 2011 detected an overcharge in the amount of 22 cents.[4] Consequently, the Department notified Diamond of the violation and directed that its personnel were required to attend mandatory training. Diamond's owners, Jose and Yolanda Peralta, attended the mandatory training.[5]

A third compliance buy was conducted at the Store in October 2011, resulting in a 9 cent overcharge to the Program.[6] The Department notified Diamond of the violation and indicated, *inter alia*, that a follow-up unannounced review would occur and that disqualification from further participation in the Program could result if further violations were detected. The final compliance buy occurred in February 2012, during which an overcharge of 20 cents occurred.[7] Consequently, the Department notified Diamond that it was disqualified from participation in the WIC Program for three years for two or more

3. The record indicates that Diamond was the subject of a compliance investigation because it was identified as a "high risk" store due to its volume of business. Although there was no testimony that Diamond was suspected of fraudulent behavior, the Department's regulations define a "high risk store" as a "store identified as a possible perpetrator of fraud or abuse through analysis of redemption patterns of WIC checks or WIC sales, or by complaints of participants or WIC Program staff." 28 Pa.Code § 1101.2.

4. An "overcharge" is defined as a "charge by a WIC authorized store to the WIC Program through redemption of a WIC check for an allowable food in excess of the store's shelf price for that food or in excess of the price charged a non-WIC participant for that food." 28 Pa.Code § 1101.2. During the compliance buy, WIC food items totaling $30.51 were presented for purchase but the Store charged the purchaser $30.73.

5. The Peraltas had attended training prior thereto as well, initially and on an annual basis.

6. That time WIC food items totaling $28.64 were presented for purchase but the Store charged the purchaser $28.73. In addition, the Store failed to display the shelf price for eggs, another violation.

7. On that occasion, WIC food items totaling $28.73 were presented for purchase but the Store charged the purchaser $28.93. In addition, the Store failed to display the shelf price for eggs and a juice product.

incidences of overcharges.[8] Diamond appealed and a hearing followed.

The Department's witnesses established, *inter alia*, the manner in which each compliance buy occurred, the facts leading to the Department's conclusion that Diamond committed three separate overcharges on three separate occasions (i.e., during three separate compliance buys), that the Department considers any overcharge, no matter how small, to constitute a violation, and that the Department considers the sanctions mandatory, leaving the Department without discretion to change them. Counsel for Diamond cross-examined the Department's witnesses trying to establish that the calculated overcharge could have resulted from purchaser error during the compliance buy. In addition, Diamond presented the testimony of Jose Peralta, the Store owner. Peralta testified that he is responsible for completing the paperwork necessary to receive payment from the WIC Program and that to his knowledge he has always done so correctly. He further indicated that if an overcharge occurred, he was not aware of it and it was not intentional.

The hearing officer credited the Department's witnesses, finding that Diamond overcharged the Program three times during three separate compliance buys. The hearing officer concluded that the Department's decision to disqualify the Store from WIC participation for three years was consistent with both federal and Departmental regulations. In doing so, the hearing officer noted that the Department's regulations provide that a sanction will be imposed if *three compliance buys*

(not three compliance investigations) detect violations. *See* 28 Pa.Code § 1105.6(b)(6). In affirming the disqualification, the hearing officer also noted that under the Department's regulations, a lack of intent to overcharge the Program is not a defense to the violation. Finally, the hearing officer rejected the argument that the Department abused its discretion in imposing the sanction. This appeal followed.

■ On appeal, Diamond first raises a confusing challenge to the Department's regulations providing for disqualification following two or more incidents of overcharges. Diamond argues: "The preliminary determination for the Hearing Examiner was whether the process followed by the [Department] constituted a single investigation or whether each of the described 'compliance buys' was [a separate instance] sufficient to constitute a determination of the requisite 'pattern of vendor overcharges' which is mandated under the federal regulations to warrant the nondiscretionary three year disqualification." Brief at 9–10.[9]

We discern no merit in this contention. Both the federal and the state regulatory schemes contemplate disqualification following a single compliance investigation if a sufficient number of violations have occurred. Specifically, the federal regulations require the State agency to conduct compliance investigations on a specified percentage of its high-risk vendors. 7 C.F.R. § 246.12(j)(4). Further, "[a] compliance investigation of a high-risk vendor may be considered complete when the

---

8. The notice of disqualification also indicated that Diamond's failure to display shelf prices of allowable food warranted disqualification for one year.

9. Before the hearing officer, Diamond argued, *inter alia*, that the multiple compliance buys

at issue constituted only one incident, thereby implying that the Department had not established a pattern of overcharges. Diamond appeared to take the view that a single investigation could not result in disqualification.

State agency determines that a sufficient number of compliance buys have been conducted to provide evidence of program noncompliance, [or] when two compliance buys have been conducted in which no program violations are found...." *Id.* § 246.12(j)(4)(i). Section 246 provides that the State agency must notify a vendor in writing "when an investigation reveals an initial incidence of a violation for which a pattern of incidences must be established in order to impose a sanction." *Id.* § 246.12(*l*)(3). In addition, "[p]rior to imposing a sanction for a pattern of violative incidences, the State agency must either provide such notice to the vendor" or document the reason for determining that provision of notice would compromise an investigation. *Id.* § 246.12(*l*)(3)(i). Moreover, once notification of an incidence of violation is provided, the agency may continue its investigation. *Id.* § 246.12(*l*)(3)(iii). Notably, "[a]ll of the incidences of a violation occurring during the first compliance buy visit must constitute only one incidence of that violation for the purpose of establishing a pattern of incidences." *Id.* § 246.12(*l*)(3)(iv). Finally, a three year disqualification must be imposed for a "pattern of vendor overcharges." *Id.* § 246.12(*l*)(1)(iii)(C).

As noted above, the purpose of a compliance investigation is to determine adherence to Program rules. When read in its entirety, it is clear that if a sufficient number of violations occurs during a single investigation, thereby demonstrating a pattern of vendor overcharges, sanctions can be imposed if the vendor was provided with the requisite notifications. Otherwise, the requirement for notification of the initial violation (if a pattern of violations is required for sanctions) as well as the provision that "all of the incidences of a violation occurring during the first compliance buy must constitute only one incidence of that violation for the purpose of

establishing a pattern of incidences" would be meaningless. The express language of the above provisions does not provide for multiple investigations before sanctions can be imposed and that requirement cannot logically be read into the scheme. Thus, we conclude that the federal scheme unambiguously authorizes the imposition of sanctions following a single compliance investigation composed of separate compliance buys if a sufficient number of violations occur. The Department's regulations are consistent with the federal scheme. Under the Department's regulatory provisions, the Department "will conduct at least two compliance buys during a compliance investigation." 28 Pa.Code § 1105.6(b)(1). Further:

> The Department will impose a sanction in accordance with § 1107.1 (relating to imposition of sanctions) if three compliance buys detect violations of a statute or regulation governing the store's participation in the WIC Program. If multiple violations are found during the compliance investigation, the Department will impose the sanction against the store for the term corresponding to the most serious violation.

*Id.* § 1105.6(b)(6). These provisions clearly contemplate the imposition of sanctions for violations detected during the course of a single investigation. The express language of Section 1105.6 simply does not support Diamond's construction that the commission of separate violations during a single investigation cannot result in the imposition of a penalty. Such a construction is simply without merit.

■ Next, Diamond asserts that 28 Pa. Code § 1107.1a(c)(3), which mandates disqualification for *two* or more incidences of overcharges, is inconsistent with the federal scheme, which purportedly requires *three* or more overcharge violations before disqualification can occur. Diamond has

not proffered any authority to support its argument and our review of the federal regulations fails to substantiate the contention. As already noted, the federal scheme mandates a three-year disqualification for a "pattern of vendor overcharges." 7 C.F.R. § 246.12(*l*)(iii)(C). In administering the WIC Program, the Department has defined the federal standard as "two or more incidences of overcharges." *See* 28 Pa.Code § 1107.1a(c)(3). This regulation is neither inconsistent with nor does it violate the federal scheme. Moreover, it is well settled that "an administrative agency has wide discretion when establishing rules, regulations and standards, and also in [the] performance of its administrative duties and functions." *Pa. Indus. for the Blind & Handicapped v. Dep't of Gen. Servs.*, 116 Pa.Cmwlth. 264, 541 A.2d 1164, 1166 (1988). A reviewing court will not overturn an agency's exercise of its discretion absent fraud, bad faith or a blatant abuse of discretion. *Id.* As the Department's interpretation of the federal scheme is reasonable and rational, not evidencing a blatant abuse of discretion, it was not error to enforce it. *See also Montgomery Cnty. Geriatric & Rehab. Ctr. v. Dep't of Pub. Welfare*, 75 Pa. Cmwlth. 248, 462 A.2d 325, 329 (1983).

Citing 7 C.F.R. § 246.12(k)(3), Diamond also contends that the Department's application of its regulatory scheme ignores the federal requirement that the vendor must be provided with an opportunity to justify or correct the overcharge or other error. Implicit in this argument is that a vendor's satisfactory correction of · an overcharge will preclude that incident from being considered in determining whether a vendor is engaging in a pattern of overcharges for purposes of disqualification. Section 246.12(k) provides, in pertinent part:

(2) *Delaying payment and establishing a claim.* When the State agency determines the vendor has committed a vendor violation that affects the payment to the vendor, the State agency must delay payment or establish a claim. Such vendor violations may be detected through compliance investigations, food instrument or cash-value voucher reviews.... The State agency may delay payment or establish a claim in the amount of the full purchase price of each food instrument or cash-value voucher that contained the vendor overcharge or other error.

(3) *Opportunity to justify or correct.* When payment for a food instrument or cash-value voucher is delayed or a claim is established, the State agency must provide the vendor with an opportunity to justify or correct the vendor overcharge or other error. If satisfied with the justification or correction, the State agency must provide payment or adjust the proposed claim accordingly.

(3) *Timeframe and offset.* The State agency must deny payment or initiate claims collection action within 90 days of either the date of detection of the vendor violation or the completion of the review or investigation giving rise to the claim, whichever is later. Claims collection action may include offset against current and subsequent amounts owed to the vendor.

This provision is not applicable in these circumstances, but rather applies to payment disputes. There is no evidence that payment to Diamond was delayed or a claim established with respect to the overcharges at issue. *See, e.g. Dasmesh Enter., Inc. v. United States,* 501 F.Supp.2d 1033, 1041 (W.D.Mich.2007) (holding that 7 C.F.R. § 246.12(h)(3)(ix) applies "when there is a dispute as to the amount of a vendor's claim for reimbursement," not to an "investigation into whether a store is in

compliance with program regulations.").[10] Notwithstanding its apparent irrelevance, there is nothing in the regulatory scheme to suggest that resolution of payment disputes under this section is a factor to be considered in determining whether sanctions are imposed for a pattern of overcharges. Finally, we note that the hearing officer credited the Department's evidence that Diamond overcharged the Program on three separate occasions and rejected Diamond's attempt to establish error on the part of the investigators/covert purchasers.

■ Diamond next contends that the hearing officer erred in concluding that the Department lacked discretion to impose a lesser sanction. In connection with this argument, Diamond asserts the federal regulations "expressly direct the State agencies who are responsible to effectuate the programs to evaluate the severity of the purported violation." Brief at 14. We must reject this argument as well.

Neither the federal nor state regulatory scheme directs that the circumstances surrounding an overcharge, such as intent to overcharge or amount involved, shall be considered in determining the sanction. The federal scheme defines an overcharge to include both intentional and unintentional conduct. *See* 7 C.F.R. § 246.3. While the Department does not define an overcharge in terms of intent, it defines a store violation, which includes overcharges, as "[i]ntentional *or unintentional* action by owners, officers, managers, agents or employees ... that violates the requirements of this part governing the store's participation in the WIC Program...." 28 Pa.

Code § 1101.2 (emphasis added). Moreover, contrary to Diamond's contention that discretion is allowed, the federal scheme mandates a three-year period of disqualification once the requisite number of overcharge violations has been detected. *See* 7 C.F.R. § 246.12(*l*)(1)(iii)(C) (providing that State agency . *must* disqualify a vendor for three years for a pattern of overcharges) (emphasis added). Although the Department's regulation is not expressed in such absolute language, it does not allow for a lesser sanction. *See* 28 Pa.Code § 1107.1a(c)(3) (providing that the Department *will* disqualify a store for three years for two or more incidences of overcharges) (emphasis added).

Diamond's reliance on *So v. Ledbetter*, 209 Ga.App. 666, 434 S.E.2d 517 (1993), does not command a different conclusion. There, the court held that the procedures employed to disqualify the authorized vendors following overcharge violations were inconsistent with the federal requirement that the circumstances surrounding the violation be considered in sanctioning the vendor. In so holding, the Georgia court specifically criticized the state agency's regulatory scheme, which imposed the same sanction whether the overcharge was an inadvertent, minor, first offense or repeated, intentional, and more significant in amount. This case is clearly distinguishable. First, the federal authority cited by the court in *So*, requiring the State agency to essentially consider mitigating factors, does not appear in the current federal regulatory scheme.[11] The concerns noted

**10.** Section 246.12(h)(3) sets forth the provisions which must be contained in agreements between the state agency and vendor, including subsection (ix), pertaining to vendor claims. This section is substantially similar to Section 246.12(k), quoted above.

**11.** According to the court, 7 C.F.R. § 246.12(k) provided at the time:

The State agency shall establish policies which determine the type and level of sanctions to be applied against food vendors, based upon the severity and nature of the Program violations observed, and such other factors as the State agency determines appropriate, such as whether the violation represented repeated offenses over a period

by the court in *So* have been incorporated into the present regulatory framework, however. For instance, disqualification does not occur until at least two or more overcharges have occurred. Thus, multiple violations must occur before a sanction is imposed. In addition, the store is notified each time an overcharge is detected, allowing the store to take corrective measures against future incidences of overcharge, and additional training is required to ensure operators are versed in Program procedures before sanctions are imposed.

Second, contrary to Diamond's contention, the regulatory scheme as promulgated classifies violations by severity, imposing less severe sanctions for less harmful violations. For instance, a six-year disqualification results from one incidence of buying or selling WIC checks for cash, 28 Pa.Code § 1107.1a(b)(1), and a one-year disqualification is imposed for two or more incidences of failing to request an identification card prior to accepting a WIC check. *Id.* § 1107.1a(d)(5).

While disqualification for overcharges totaling 51 cents may initially seem harsh, it bears emphasizing that the Program is publicly-funded and intended for the benefit of a nutritionally at-risk population; it is not designed or intended as an entitlement or revenue-enhancing program for retail vendors. Further, while the individual overcharges here are nominal in amount, the cumulative effect of minor overcharges committed on a frequent basis could very well be profitable to the retailer, to the detriment of the Program and the WIC participant, whose check will buy less because she is being overcharged for allowable food.

Accordingly, based upon the above, we affirm the Department's order disqualifying Diamond from Program participation for three years.

### ORDER

AND NOW, this 7th day of November, 2013, the order of the Department of Health in the above-captioned matter is hereby affirmed.

of time, whether the offenses represented vendor policy or whether they represented the actions of an individual employee who did not understand Program rules, and whether prior warning and an opportunity for correction was provided to the vendor. 434 S.E.2d at 520.