IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Randy & Dayleen, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Department of Health, | : | No. 1221 C.D. 2017 |
| Respondent | : | Argued: April 12, 2018 |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE P. KEVIN BROBSON, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON                    FILED:  May 10, 2018

Randy & Dayleen (Store) petitions for review of the July 31, 2017 order of the Department of Health (Department), which affirmed the April 25, 2016 decision of the Department's Bureau of Women, Infants and Children (WIC) disqualifying the Store from participation in the WIC program for a period of three years.  We affirm.

On April 25, 2016, the Department mailed the Store a letter informing it that the Department was disqualifying the Store from participation in the WIC program for a period of three years because of two or more incidents of overcharges[1]

---

[1] An overcharge is "[a] charge by a WIC authorized store to the WIC Program through redemption of a WIC check for an allowable food in excess of the store's shelf price for that food or in excess of the price charged a non-WIC participant for that food."  28 Pa. Code § 1101.2; *see*

discovered during a compliance investigation.[2]  Hearing Examiner's Findings of Fact (F.F.) No. 81.  The Store filed an appeal with the Department, and a hearing was held on April 19, 2017, at which both the Store and the Department offered evidence.

The Department presented the testimony of Jannette Mosquera (Mosquera), an investigator with the Department's WIC program.  F.F. No. 23. Mosquera explained how she conducts compliance buys.  *Id*.  Mosquera testified that she is given vouchers to purchase food items at a store under an alias. Reproduced Record (R.R.) at 87a-88a; *see* F.F. No 26.  Mosquera takes notes during her buy, including recording the prices for each item she purchases.  R.R. at 87a, 89a & 92a.  As she is gathering the items for purchase, she records the price as listed on the shelf or on the item itself, or if those are not available, she asks the cashier.  R.R. at 89a.

Mosquera testified that she conducted compliance buys at the Store on October 6, 2015 and on December 28, 2015.  F.F. Nos. 25 & 41.  Mosquera testified that immediately after each compliance buy, she completed a Pennsylvania Compliance Buy Report Form For WIC Retail Stores (Compliance Buy Report), which documented the results of her buys.  F.F. Nos. 25 & 41.  R.R. at 86a-87a &

---

*also* F.F. No. 79.  An overcharge includes both intentional and unintentional conduct.  *Diamond Mini Mkt. v. Dep't of Health*, 79 A.3d 759, 765 (Pa. Cmwlth. 2013) (citing 7 C.F.R. § 246.3).

[2] A compliance investigation is "[a] series of at least two compliance buys conducted at the same WIC authorized store."  28 Pa. Code § 1101.2; *see also* Department's 7/31/17 Adjudication at 13.

A compliance buy is "[a] covert purchase at a WIC authorized store, with a WIC check, conducted to enable the Department to evaluate adherence by a WIC authorized store with this part governing the store's participation in the WIC Program."  28 Pa. Code § 1101.2, *see also* F.F. No. 77.

2

92a. Reading from the Compliance Buy Reports for each of the buys on October 6, 2015 and December 28, 2015, Mosquera described the items she bought, along with each item's size, quantity and price. R.R. at 89a, 92-94a; *see* F.F. Nos. 27-32, 43-46. Mosquera testified that she speaks Spanish but could not recall what language she used with the cashier during her compliance buys on October 6, 2015 and December 28, 2015. F.F. Nos. 24 & 48.

The Department also offered the testimony of Jay Mast (Mast), who supervises the Department's section that reviews compliance buy investigations. F.F. No. 52. Mast is familiar with the compliance investigation of the Store. *Id*. Mast testified regarding the amount of the WIC checks deposited by the Store for the compliance buys. R.R. at 105a-10a. Mast explained that his staff completes a Compliance Investigation Purchase Calculation Form based off of the report that the investigator completes for the compliance buy. *Id*. at 104a; *see* R.R. at 108a-09a. Mast identified the checks as well as the Compliance Investigation Purchase Calculation Forms relating to the October 6, 2015 and December 28, 2015 compliance buys. R.R. at 104a-05a, 107a-09a.

The Department moved into evidence the Compliance Buy Reports, Compliance Investigation Purchase Calculation Forms and checks from each of the compliance buys on October 6, 2015 and December 28, 2015. Department's 7/31/17 Adjudication (Adjudication) at 2. These documents were admitted into evidence without objection. *See id*.; F.F. Nos. 54-55.

The Store's owner appeared and testified on the Store's behalf. F.F. No. 84. The Store also offered rebuttal testimony from a Store employee. Adjudication at 17. Both testified that the Store's cashier spoke little to no English. R.R. at 118a & 121a; *see* F.F. No. 5. The Store's owner admitted, however, that the

3

cashier spoke and understood "basic stuff" such as numbers, and that if he were asked a price, he could answer. F.F. No. 5; R.R. at 118a-19a.

Based on the evidence presented, the hearing examiner made the following findings with respect to the October 6, 2015 compliance buy. The aggregate cost of the shelf prices observed for the Food Instrument (FI)[3] was $28.56; however, the total amount annotated on the FI after the Store's cashier added the costs of the items was $37.05. F.F. Nos. 35-36; *see* R.R. at 107a. The aggregate cost for the shelf prices observed for the Cash-Value Voucher (CVV)[4] transaction was $7.16; however, the CVV redeemed by the Store was in the amount of $7.96. F.F. Nos. 37-38. The Store overcharged WIC in the amount of $8.49 for the items purchased with the FI, and $0.80 for the items purchased with the CVV. F.F. Nos. 49-50; *see* R.R. at 107a.

With respect to the December 28, 2015 compliance buy, the hearing examiner made the following findings. The aggregate cost of the shelf prices observed for the FI was $30.65; however, the total amount annotated on the FI was $37.05. F.F. Nos. 56-57. The aggregate cost for the shelf prices observed for the CVV transaction was $7.16; however, the CVV redeemed by the Store was in the

---

[3] A Food Instrument is "a voucher, check, electronic benefits transfer card (EBT), coupon or other document which is used by a participant to obtain supplemental foods." 7 C.F.R. § 246.2. Supplemental foods are "those foods containing nutrients determined by nutritional research to be lacking in the diets of pregnant, breastfeeding and postpartum women, infants, and children, and foods that promote the health of the population served by the WIC Program as indicated by relevant nutrition science, public health concerns, and cultural eating patterns, as prescribed by the Secretary in § 246.10." *Id*.

[4] A Cash-Value Voucher is "a fixed-dollar amount check, voucher, electronic benefit transfer (EBT) card or other document which is used by a participant to obtain authorized fruits and vegetables. Cash-value voucher is also known as cash-value benefit (CVB) in an EBT environment." 7 C.F.R. § 246.2.

4

amount of $7.96.[5]  F.F. Nos. 58-59.  Consequently, the hearing examiner found that the Store overcharged WIC the amount of $6.40 for the items purchased with the FI and $0.84[6] for the items purchased with the CVV.  F.F. Nos. 60-61.

The hearing examiner concluded that the evidence supported the Department's determination that the Store overcharged the WIC program during two separate compliance buys conducted on October 6, 2015 and December 28, 2015.  Conclusions of Law (C.L.) No. 3.  The hearing examiner further concluded that the Department's determination to disqualify the Store from participation in the WIC program for three years is consistent with State and Federal regulations and supported by the evidence.  C.L. No. 4.  Accordingly, on July 31, 2017, the hearing examiner issued an order affirming the Department's April 25, 2016 decision to disqualify the Store from participation in the WIC program for a period of three years.  Department's 7/31/17 Order.

The Store now petitions for review of the Department's July 31, 2017, adjudication and order, raising the following two issues for our review:[7]  (1) whether the Department met its burden of proof in establishing the Store's violations of the WIC program; and (2) whether the Department abused its discretion by disqualifying the Store from participation in the WIC program for a period of three years.

---

[5] The hearing examiner's Finding of Fact contains a typographical error in that the CVV was redeemed for $8.00, not $7.96.  *See* R.R. at 110a.  This typographical error does not affect our analysis or the result, as the CVV was still redeemed for more than the observed shelf prices.

[6] *See* n.5, *supra.*  Thus, the overcharged amount of $0.84 for the CVV is correct, even though the math is not accurate using the figures set forth in the Findings of Fact.

[7] Our review is limited to determining whether an error of law was committed, whether constitutional rights were violated or whether necessary findings of fact are supported by substantial evidence.  2 Pa. C.S. § 704; *Woods Servs., Inc. v. Dep't of Pub. Welfare*, 803 A.2d 260, 263 (Pa. Cmwlth. 2002), *aff'd*, 839 A.2d 184 (Pa. 2003).

The Store argues that the Department failed to establish the Store's violations of the WIC program, because the hearing examiner abused its discretion in crediting Mosquera's testimony. The Store argues that because Mosquera's testimony did not take place until April 19, 2017, her independent recollection of the details was not reliable and she could only reiterate what was recorded in her previously recorded Compliance Buy Reports. Store's Brief at 10. The Store also argues that the situation is unfair because its cashier did not speak English.

The Store's argument is without merit, as it is nothing more than an attempt to argue the Store's preferred version of the facts. The hearing examiner expressly rejected the Store's contention that the Department's witnesses lacked credibility due to their purported inability to credibly recall the events of the compliance buys. Adjudication at 17. Additionally, the hearing examiner ruled that the Store's attack on the validity of the compliance buys based upon its cashier's inability to speak English was not supported by the evidence. *Id.*; *see* F.F. No. 5. The hearing examiner noted that Mosquera spoke Spanish and that the record showed that the cashier spoke limited English and was able to understand the basics of English, including numbers and prices.[8] *Id.*; *see* F.F. Nos. 5 & 24; R.R. at 118a-19a.

___

[8] The hearing examiner noted that the Store's owner was not present at the Store during any of the compliance buys and, therefore, had no personal knowledge. Adjudication at 17; F.F. No. 2. The store employee who testified also was not present when the cashier interacted with the investigators during the compliance buys. F.F. No. 8.

The Store's owner completed its annual mandatory training prior to August 25, 2015 and then trained the Store's cashier in Spanish. F.F. Nos. 66 & 71.

A WIC authorized store is required to attend corrective training after two compliance buys detect violations of a statute or regulation governing the store's participation in the WIC program. F.F. No. 72; *see* 28 Pa. Code § 1105.6(b)(4). The Department had also detected a violation after a compliance buy on August 25, 2015. *See* F.F. Nos. 14 & 22. Thus, the Store was required to

The hearing examiner is the arbiter of credibility. *Colon v. Dep't of Pub. Welfare*, 537 A.2d 936, 940 (Pa. Cmwlth. 1988). Such determinations are binding on appeal unless made arbitrarily and capriciously.[9] *Casne v. Workers' Comp. Appeal Bd., (Stat Couriers, Inc.)*, 962 A.2d 14, 19 (Pa. Cmwlth. 2008). Here, the factfinder did not observe the testimony that is the basis of the evidence.[10] Because the factfinder was not present during the testimony, there is a need for an articulated, reasoned basis for credibility determinations. *McElwee v. Se. Pennsylvania Transp. Auth.*, 948 A.2d 762, 774 n.10 (Pa. 2008).

In his thorough and well-written adjudication, the hearing examiner explained that Mosquera recorded the events of the compliance buys either contemporaneously with the buys or soon thereafter and that the Compliance Buy Reports thoroughly memorialized the events of each transaction. *See* Adjudication at 16-18; F.F. No. 25. The hearing examiner further found that the information contained in the Department's documents, along with the Department's hearing testimony, provided credible evidence of the Store's overcharging of WIC.

---

attend mandatory corrective training and did so on or about November 13, 2015. F.F. No. 73. After store personnel have attended mandatory corrective training, the Department continues its compliance investigation. 28 Pa. Code § 1105.6(b)(5).

[9] "A capricious disregard of evidence exists 'when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result.'" *Casne v. Workers' Comp. Appeal Bd. (Stat Couriers, Inc.)*, 962 A.2d 14, 19 n.5 (Pa. Cmwlth. 2008) (quoting *Station Square Gaming L.P. v. Pa. Gaming Control Bd.*, 927 A.2d 232, 237 (Pa. 2007)). "The meaning of arbitrary includes 'founded on prejudice or preference rather than on reason or fact.'" *Casne*, 962 A.2d at 19 n.5 (quoting BLACK'S LAW DICTIONARY 112 (8th ed. 2004)).

[10] The hearing examiner who presided over the hearing subsequently left the Department, so the matter was reassigned to another hearing examiner who issued the July 31, 2017 adjudication and order that is before the Court.

Adjudication at 18. The hearing examiner provided a reasoned basis for his credibility determinations; thus, those determinations are not arbitrary or capricious.

Additionally, our review of the record reveals that the findings of fact are supported by substantial evidence. Therefore, the findings are conclusive and binding on this Court. *Woods Servs., Inc. v. Dep't of Pub. Welfare*, 803 A.2d 260, 263 (Pa. Cmwlth. 2002), *aff'd*, 839 A.2d 184 (Pa. 2003). The findings support the hearing examiner's conclusion that the Department sustained its burden to prove that the Store overcharged the WIC program during two separate compliance buys conducted at the Store on October 6, 2015 and December 28, 2015.

Next, the Store raises the issue of whether the Department abused its discretion by disqualifying the Store from participation in the WIC program for a period of three years. The Store argues that its violations were *de minimis* and a three-year suspension is unfair.

The Department, however, has no discretion regarding the length of the disqualification to be imposed. *See Diamond Mini Mkt. v. Dep't of Health*, 79 A.3d 759, 761 (Pa. Cmwlth. 2013) (disqualifying a store for three overcharges totaling 0.51 cents despite it being a "nominal" amount). The Department's regulations provide, in pertinent part, that "The Department *will* disqualify a WIC authorized store for 3 years for any of the following violations: . . . [t]wo or more incidences of overcharges." 28 Pa. Code § 1107.1a(c)(3) (emphasis added). In *Diamond Mini Market*, we addressed the issue of discretion, stating:

> the federal scheme mandates a three-year period of disqualification once the requisite number of overcharge violations has been detected. *See* 7 C.F.R. § 246.12(*l*)(1)(iii)(C) (providing that State agency *must* disqualify a vendor for three years for a pattern of overcharges) (emphasis added). Although the Department's regulation

8

> is not expressed in such absolute language, it does not allow for a lesser sanction. *See* 28 Pa. Code § 1107.1a(c)(3) (providing that the Department *will* disqualify a store for three years for two or more incidences of overcharges) (emphasis added).

*Id*. at 765. We further noted that neither federal nor state regulations direct that the circumstances surrounding an overcharge, such as intent to overcharge or amount involved, shall be considered in determining the sanction. *Id*. at 766. Thus, where, as here, the Department determines that a store engaged in "two or more incidences" of overcharges, the Department's regulations *require* the Department to disqualify a store from the WIC program for a period of three years.[11] *See* 28 Pa. Code § 1107.1a(c)(3); *see also Diamond Mini Mkt.*, 79 A.3d at 765. Consequently, the Department did not abuse its discretion.

Accordingly, for the foregoing reasons, we affirm.

_____
CHRISTINE FIZZANO CANNON, Judge

---

[11] Additionally, as the hearing officer noted, the Store cannot evade responsibility by attributing the overcharges to the cashier involved in the October 6, 2015, and December 28, 2015 transactions. *See* 7 C.F.R. § 246.12(h)(3)(xiv) (stating that the vendor (the entity operating the store) is "accountable for owners, officers, managers, agents and employees who commit vendor violations"); 28 Pa. Code § 1101.2 (defining a "store violation" as the "[i]ntentional or unintentional action by the owners, officers, managers, agents or employees of a WIC authorized store that violates the requirements in this part governing the store's participation in the WIC Program . . . .").

9

Randy & Dayleen, : 
        Petitioner : 
        : 
    v. : 
        : 
Department of Health, :    No. 1221 C.D. 2017
        Respondent : 

## O R D E R

AND NOW, this 10th day of May, 2018, the July 31, 2017 order of the Department of Health is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge