IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Obimak Enterprise,                    :
                   Petitioner         :
                                      :    No.  1294 C.D. 2017
          v.                          :
                                      :    Argued:  November 13, 2018
Department of Health,                 :
                   Respondent         :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                              FILED:  December 6, 2018


          Obimak Enterprise (Obimak) petitions for review of the August 18, 2017 decision of a Pennsylvania Department of Health, Division of Women, Infants, and Children (WIC) hearing examiner, affirming the decision of the WIC Bureau (Bureau) to disqualify Obimak from participation in the WIC program for three years.


## Background

          The relevant facts in this matter are mainly garnered from the Department of Health (Department) hearing examiner's written adjudication. Obimak is a store located in Philadelphia that was previously authorized to participate

in the WIC program.[1]  (Department Adjudication, Findings of Fact (F.F.) No. 1).  The WIC program is funded through the United States Department of Agriculture and provides cash grants to state agencies to administer the program through local agencies.  *See generally* 7 C.F.R. §246.1; 28 Pa. Code §1101.1(a).  In Pennsylvania, the Department is responsible for administering the WIC program.  28 Pa. Code §1101.1.

WIC authorized stores are required to comply with federal and state regulations that govern the WIC program.  7 C.F.R. §246.12(h)(3); 28 Pa. Code §1105.3(a)(1).  To monitor stores' compliance with the WIC regulations, the WIC administrators conduct unannounced onsite store visits, including compliance investigations and WIC transaction reviews.  28 Pa. Code §1105.6(a)(1).  A compliance investigation is "[a] series of at least two compliance buys conducted at the same WIC authorized store."  28 Pa. Code §1101.2.  A compliance buy is "[a] covert purchase at a WIC authorized store, with a WIC check, conducted to enable the Department to evaluate adherence by a WIC authorized store" to the regulations governing the store's participation in the WIC program.  *Id.*  A WIC check is "[a] negotiable instrument issued to participants to purchase allowable foods at WIC authorized stores."  *Id.*  The WIC regulations also provide that a WIC store may not engage in "overcharges."  28 Pa. Code §1105.3(b)(3).  An overcharge is "[a] charge by a WIC authorized store to the WIC program through redemption of a WIC check for an allowable food in excess of the store's shelf price for that food or in excess of the price charged a non-WIC participant for that food."  28 Pa. Code §1101.2.

_____

[1] "The purpose of the WIC program is to provide allowable foods to income eligible pregnant, breast-feeding or postpartum women, infants and children up to [five] years of age, who are at nutritional risk because of medical problems or poor diets."  28 Pa. Code §1101.1.

The Department annually trains local agency employees on how to conduct compliance buys and observe prices. (F.F. No. 10.) Philadelphia County North, Inc. (North) is a local agency that manages the WIC program in Philadelphia, including the area where Obimak is located. (F.F. No. 11.) Lavar Utsey is employed by North as a nutrient assistant/secret shopper, and Utsey regularly conducts compliance buys for North. (F.F. No. 12.) Utsey has been trained by North to conduct compliance buys, receives additional training annually, and has been conducting compliance buys since approximately September 2015. (F.F. Nos. 12-13.) Based on his training, when Utsey conducts compliance buys he observes food prices on store shelves and reviews WIC stores' competitive price lists and food list posters. (F.F. No. 14.) When conducting a compliance buy, Utsey typically enters the observed prices of items he purchases into his phone's calculator application (app) in a running tally in the same order the items appear on the WIC checks. (F.F. No. 15.) After he completes the compliance buy, Utsey completes a Compliance Buy Report Form, based on the price information in his phone and memory, and donates the purchased items to a local charity. (F.F. No. 16.)

On November 12, 2015, Utsey conducted a compliance buy at Obimak (First Compliance Buy) in the manner in which he had been trained. (F.F. No. 19.) Utsey entered Obimak at 11:30 a.m. (F.F. No. 20.) When Utsey entered the store for the First Compliance Buy, the store clerk asked him if he was there to purchase WIC items. (F.F. No. 21). After Utsey confirmed he was there to purchase WIC items, the clerk proceeded to shop for him. (F.F. No. 21.) The clerk did not permit Utsey to pick out his own items and required him to pick bagged fruits and vegetables, rather than canned green beans and corn. *Id.* During the First Compliance Buy, Utsey attempted to purchase a 14.5-ounce box of Post Fruity Pebbles, but the clerk would not permit it because she informed him that it was an unauthorized cereal. (F.F. No. 22.) Throughout the First Compliance Buy, Utsey observed that the prices of the

3

items were on the shelves. (F.F. No. 23.) After observing the shelf prices, Utsey entered them into the calculator app on his phone. (F.F. No. 24.) For the First Compliance Buy, Utsey purchased the items using WIC program food instrument[2] (FI) check number 2577054297 and WIC program cash value voucher[3] (CVV) number 2577054351. (F.F. No. 25.) After the First Compliance Buy on November 12, 2015, Utsey filled out a Compliance Buy Report Form (First Compliance Buy Report Form). (F.F. No. 26.) According to the First Compliance Buy Report Form, during the First Compliance Buy, Utsey purchased six items using FI check number 2577054297. (F.F. No. 27.) These items had observed shelf prices totaling $28.72. *Id.* The First Compliance Buy Report Form also indicates that Utsey purchased three fruit items, with observed shelf prices totaling $7.00, using CVV number 2577054351. (F.F. No. 28.)

Jay Mast is the Program Manager with the Bureau and, therefore, is the custodian of compliance investigation files and receives Compliance Buy Report Forms, which are completed by investigators. (F.F. No. 30.) After receiving the First Compliance Buy Report Form, as well as FI check number 2577054297 and CVV number 2577054351, which were redeemed by Obimak for those transactions, Mast's office completed a Compliance Investigation Purchase Calculation Form. (F.F. No. 31.) "Based on the prices observed by Mr. Utsey, the shelf prices of the items

---

[2] A food instrument is "a voucher, check, electronic benefits transfer card (EBT), coupon or other document which is used by a participant to obtain supplemental foods." 7 C.F.R. §246.2. Supplemental foods are "those foods containing nutrients determined by nutritional research to be lacking in the diets of pregnant, breastfeeding and postpartum women, infants, and children, and foods that promote the health of the population served by the WIC Program . . . ." *Id.*

[3] A cash value voucher is "a fixed-dollar amount check, voucher, electronic benefit transfer (EBT) card or other document which is used by a participant to obtain authorized fruits and vegetables." 7 C.F.R. § 246.2.

purchased using the FI totaled $28.72, but the amount[] entered in the 'Pay Exactly' box on FI check number 2577054297 was $37.45, which amounts to a discrepancy, in the form of an overcharge of $8.73."[4] (F.F. No. 32.) Moreover, "[b]ased on the prices observed by Mr. Utsey, the prices of the items purchased using the CVV totaled $7.00, but the amount entered in the 'Pay Exactly' box on CVV number 2577054351 was 8.00, which amounts to a discrepancy, in the form of an overcharge of $1.00." (F.F. No. 33.) According to the First Compliance Buy Report Form, during the First Compliance Buy, Utsey also purchased a one-liter Day's soda for $1.00 in cash. (F.F. No. 34.) Based on the Compliance Investigation Purchase Calculation Form for the First Compliance Buy, Obimak charged the WIC program $8.73 more than the cost of the food purchased on FI check number 2577054297, and $1.00 more than the cost of the food purchased using CVV number 2577054351.[5] (F.F. No. 35.)

The Department conducted a second compliance buy on January 20, 2016, and a third compliance buy on August 9, 2016 (Third Compliance Buy). (F.F. Nos. 39-40.) For the Third Compliance Buy, Debbie Rush, a designated investigator for the WIC program, entered Obimak at 10:00 a.m. on August 9, 2016. (F.F. No.

_____

[4] The relevant Department regulation requires WIC authorized stores to "[r]ecord in ink, on each WIC check immediately after completion of the WIC transaction and prior to the participant or authorized representative signing the WIC check, the actual purchase amount of the transaction net of any cents-off coupon or other discounts." 28 Pa. Code §1105.3(c)(7).

[5] The price established by the Department, at or below which WIC authorized stores must maintain a specified minimum inventory, is the competitive price, and the WIC program issues competitive price lists quarterly. 28 Pa. Code §1101.2. Although Obimak argued that the items purchased during the First Compliance Buy had been sold for their "competitive price," the hearing examiner found that if Obimak had charged the prices on the competitive price list in effect on November 12, 2015 for the items purchased using FI check number 2577054297, the prices would have totaled $35.48. (F.F. No. 37.) Thus, even if Obimak had charged the competitive price list prices for these items, there still would have been a discrepancy in the form of an overcharge, because Obimak charged $1.97 more than the competitive price list prices. (F.F. No. 38.)

5

41.) Rush completed a Compliance Buy Report Form shortly after the Third Compliance Buy (Third Compliance Buy Report Form). (F.F. Nos. 40, 43.) After receiving the Third Compliance Buy Report Form, and the FI and CVV redeemed by Obimak, Mast's office completed a Compliance Investigation Purchase Calculation Form. (F.F. No. 44.) According to the Third Compliance Buy Report Form, during the Third Compliance Buy, Rush purchased seven different items using FI check number 3307337254. (F.F. No. 45.) These items had observed shelf prices totaling $31.50. *Id.* Based on the prices that Ms. Rush observed and entered in the Third Compliance Buy Report Form for the Third Compliance Buy, "the cost of the items purchased using FI check number 3307337254 totaled $31.50, but the amount entered in the 'Pay Exactly' box on the FI was $34.87, which amounts to a discrepancy, in the form of an overcharge of $3.37." (F.F. No. 46.) Thus, based on the Compliance Investigation Purchase Calculation Form for the Third Compliance Buy, Obimak "charged the WIC program $3.37 more than the cost of the food purchased on FI check number 3307337254."[6] (F.F. No. 47.) Immediately after each of their respective compliance buys, both Utsey and Rush donated the items purchased to a local charity and obtained the signature of an individual at the charity, which certified the receipt of the number and types of items listed in the Compliance Buy Report Forms. (F.F. No. 50.)

On January 31, 2017, a WIC program representative signed and sent Obimak a disqualification letter informing it of the details of the three compliance buys and notifying it that it was disqualified from participation in the WIC program

---

[6] The hearing examiner also noted that if Obimak had charged the prices on the competitive price list that were in effect at the time of the Third Compliance Buy on August 9, 2016, the prices for the items purchased would have been $34.77. (F.F. No. 48.) Accordingly, even if Obimak had charged the competitive price list prices for these items, there still would have been a discrepancy in the form of an overcharge, because Obimak charged $.10 more than the competitive price list prices. (F.F. No. 49.)

6

for three years because of two or more incidences of overcharges. (F.F. No. 51.) Obimak timely appealed and an evidentiary hearing was held on March 10, 2017. (F.F. No. 53; Department Adjudication at 1.) Through its owner, Ousmane Tounkara, Obimak presented evidence at the hearing in support of its appeal, but chose to appear at the hearing without counsel. (F.F. No. 54.) Following the hearing, both Obimak and the Department submitted post-hearing briefs. (F.F. No. 54; Department Adjudication at 1.)

The Department hearing examiner concluded that the record supported the Department's determination that Obimak overcharged the WIC program during two separate compliance buys that were conducted at Obimak on November 12, 2015, and August 9, 2016. (Department Conclusion of Law (COL) No. 3.) The hearing examiner determined that the Department had met its burden of proof in the matter and that Obimak had failed to present sufficient credible evidence to support its appeal. (Department Adjudication at 25.) The hearing examiner noted that one of the terms and conditions of participation in the WIC program is that stores may not charge more than the store's shelf price for one or more allowable foods. (Department Adjudication at 26.) The hearing examiner concluded that during two of the three compliance buys conducted at Obimak, it was not in compliance with Department regulations due to engaging in a total of three overcharges. *Id.* Because the Department's regulations require that two or more incidences of overcharges result in disqualification from the WIC program for three years, the hearing examiner decided that the Department had properly followed its regulations. *Id.* Therefore, the hearing examiner affirmed the decision of the Department to disqualify Obimak from participation in the WIC program for three years. (Department order, August 18, 2017.)

7

**Discussion**

Obimak now petitions for review of the Department's August 18, 2017 order.[7] Obimak raises the following two issues for our review: (1) whether the Department's decision must be reversed where it failed to consider evidence that could refute allegations of an overcharge of eligible WIC items by Obimak; and (2) whether the Department's decision to de-authorize Obimak from participation in the WIC program must be reversed where the compliance report used to substantiate allegations of overcharge of WIC-eligible items contained numerous errors of material fact. Because Obimak does not separately address the issues it raises in its brief, we address both issues simultaneously.

Obimak disputes facts contained in the First Compliance Buy Report Form, which the hearing examiner relied on in making her findings of fact. Obimak argues that although the First Compliance Buy Report Form states that Utsey purchased a one-liter Day's soda, Obimak has never sold one-liter sodas or Day's products at its store. Obimak claims that because the hearing examiner mistakenly found that Utsey purchased a Day's product, it disregarded crucial evidence when deciding to disqualify Obimak from the WIC program.

Obimak also points to other alleged factual errors and inconsistencies in the record to support its argument that the hearing examiner ignored relevant evidence. Obimak contends that the First Compliance Buy Report Form is inconsistent because it alleges that the investigator donated the one-liter Day's soda on November 12, 2015, which was the day **before** it was allegedly purchased. Obimak further argues that although the First Compliance Buy Report Form alleges

_____

[7] Our review is "limited to determining whether the petitioner's constitutional rights were violated, whether errors of law were made, and whether necessary findings are supported by substantial evidence of record." *Valesky's Market v. Department of Health*, 779 A.2d 1251, 1253 (Pa. Cmwlth. 2001).

8

Utsey purchased a one-pound bag of Paramount oranges, Obimak does not sell that brand of oranges and does not sell oranges by the pound, but instead sells them by the unit. Next, Obimak disputes the First Compliance Buy Report Form's description of the plantains that were purchased during the First Compliance Buy because the report does not state whether the plantains were yellow or green. Obimak maintains that green plantains are cheaper than yellow plantains and that, "[a]t this point no one will ever be able to determine if [Utsey] took green plantains or yellow plantains." (Obimak's Brief at 13.) Since the type of plantains purchased would affect the total price contained in the First Compliance Buy Report Form, Obimak appears to argue that the investigator's failure to include the color of the purchased plantains in the report impugns its overall reliability. Finally, Obimak contends that it has never sold 14.5-ounce cereal boxes, as stated in the First Compliance Buy Report Form.

In response, the Department asserts that the hearing examiner's finding that Obimak committed overcharge violations on November 12, 2015, and August 9, 2016, is supported by substantial evidence. The Department contends that the hearing examiner found Utsey's testimony credible and that the Compliance Buy Report Forms contained accurate information. The Department argues that the hearing examiner considered Obimak's testimony, but found the Department's witnesses and evidence more credible.

The Department argues that Obimak did not offer any evidence relating to the Day's soda during the hearing, and notes that the issue was raised for the first time in a post-hearing brief. Further, the Department maintains that even if Obimak were to establish that the hearing examiner's finding regarding the Day's soda was not supported by substantial evidence, it would not change the outcome because the purchase of the Day's soda did not factor into the decision to disqualify Obimak from the WIC program. With regard to the fruit purchased on November 12, 2015, the Department notes that the hearing examiner determined the Department's witnesses

9

were more credible than Obimak's self-serving statements. Moreover, the Department alleges that even if this Court was to disregard the hearing examiner's findings regarding the overcharge for the plantains and oranges, there is still sufficient evidence, based on the other two overcharges relating to the two FIs that were used, to uphold Obimak's disqualification from the WIC program. Because, it contends, there is substantial evidence that Obimak committed two or more overcharges, the Department urges us to uphold the hearing examiner's decision.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *B.B. Kim's Market, Inc. v. Department of Health, Division of Women, Infants & Children (WIC)*, 762 A.2d 1134, 1135 (Pa. Cmwlth. 2000). "For purposes of appellate review, it is irrelevant whether there is evidence to support contrary findings; if substantial evidence supports the [fact-finder]'s necessary findings, those findings will not be disturbed on appeal." *Verizon Pennsylvania Inc. v. Workers' Compensation Appeal Board (Mills)*, 116 A.3d 1157, 1162 (Pa. Cmwlth. 2015). When "performing a substantial evidence analysis, this Court must view the evidence in a light most favorable to the party who prevailed before the fact-finder." *WAWA v. Workers' Compensation Appeal Board (Seltzer)*, 951 A.2d 405, 408 (Pa. Cmwlth. 2008). Further, when determining whether substantial evidence exists to support a finding of fact, this Court must give to the party in whose favor the appealed decision was decided "the benefit of all inferences that can logically and reasonably be drawn from the evidence." *B.J.K. v. Department of Public Welfare*, 773 A.2d 1271, 1276 (Pa. Cmwlth. 2001).

Additionally, it is well-established that the "credibility and weight to be accorded the evidence are [sic] a determination solely within the discretion of the fact finder." *Colonial Gardens Nursing Home, Inc. v. Department of Health*, 382 A.2d 1273, 1276 (Pa. Cmwlth. 1978). "As the fact finder, the hearing examiner's role is to resolve conflicts in testimony and reject the testimony of any witness." *Gonzalez-*

10

*Carmelo v. Department of Public Welfare*, 819 A.2d 175, 180 (Pa. Cmwlth. 2003). When the fact-finder has determined the weight and credibility of evidence, this Court will only disturb such determinations if they are "arbitrary and capricious or so fundamentally dependent on a misapprehension of facts, or so otherwise flawed, as to render it irrational." *Verizon Pennsylvania Inc.*, 116 A.3d at 1162.

Here, Obimak's argument is nothing more than an attempt to have this Court accept its version of the facts, rather than those found by the hearing examiner. Obimak does not provide any citations to the record to dispute the hearing examiner's findings of fact. Nevertheless, after a careful review of the record, we conclude that the disputed findings of fact are supported by substantial evidence.

First, with regard to Obimak's argument that it does not and has never sold one-liter Day's sodas, the hearing examiner noted that although Obimak raised the Day's soda argument in its post-hearing brief, "there is no evidence in the record whatsoever about what kind and size of soda [Obimak] carried, because Mr. Tounkara never raised the issue during the hearing. A mere assertion in a post-hearing brief is not the equivalent of evidence admitted at the hearing." (Department Adjudication at 17.) Our review of the record reveals that Obimak, indeed, did not present evidence at the hearing regarding the size or types of sodas sold at its store. Accordingly, we agree with the hearing examiner that Obimak makes the assertion regarding the Day's soda "without any evidence to support it, and no validity can be assigned to this argument."[8] *Id.* Moreover, based on the First Compliance Buy Report Form, which was entered into the record during the hearing and showed that

---

[8] The Department's regulation regarding the hearing record in WIC hearings provides as follows: "*Contents of the record*. The verbatim transcript or recording of testimony and exhibits, or an official report containing the substance of what transpired at the hearing, together with all papers and requests filed in the proceeding, shall constitute the hearing record." 28 Pa. Code §1111.9. Thus, the regulation does not permit the introduction of evidence after the hearing.

11

Utsey purchased a Day's soda, the hearing examiner reasonably found that Mr. Utsey purchased a one-liter Day's soda for $1.00 in cash.[9] (F.F. No. 34; Reproduced Record (R.R.) at 30a.) Thus, there is substantial evidence in the record to support the hearing examiner's conclusion that Utsey purchased a one-liter Day's soda.[10]

Similarly, with regard to the type of oranges sold, during the hearing Obimak never presented evidence that it does not sell Paramount oranges. We agree with the hearing examiner that because Obimak did not introduce evidence of the type of oranges it sells at the hearing, "no credence can be given to the unsupported assertion" that Obimak never sold Paramount oranges, and that the "assertion cannot be used to discredit Mr. Utsey's testimony or the [First] Compliance Buy Report Form that Mr. Utsey prepared." (Department Adjudication at 20.)

Obimak did, however, present evidence at the hearing that it only sells oranges by the unit, rather than the pound, as stated in the First Compliance Buy Report Form. Specifically, Mr. Tounkara testified that Obimak only sells oranges by the unit instead of the pound, and introduced an exhibit that supposedly represented a store price listing showing that the oranges were priced by unit, not weight. (Hearing Notes of Transcript (N.T.) at 49-51; Hearing Ex. A-11.) Nonetheless, the hearing examiner discredited the price list introduced into evidence because there was no proof, other than Mr. Tounkara's "self-serving testimony" that the price list was ever

[9] Obimak also alleges that there are discrepancies in the dates of the purchase of the Day's soda because the First Compliance Buy Report Form states that the investigator donated the soda the day before purchasing it. However, the hearing examiner provided extensive discussion in her written adjudication regarding any purported date discrepancy, noting that the discrepancy was insignificant because it was a common error for people to inadvertently write a wrong date when dating something. (Department Adjudication at 16-18.)

[10] However, we note that even if there were not substantial evidence of the purchase of the Day's soda, it would not change the outcome because the Day's soda did not factor into the disqualification, as Utsey did not use a WIC check to purchase the Day's soda, but rather paid for it in cash. *See* F.F. No. 34.

actually posted in the store. (Department Adjudication at 18.) The hearing examiner also noted that in the photographs of the store's produce section that were introduced into evidence by Obimak, the alleged price list was not visible anywhere. *Id.*

Further, Utsey testified during the hearing that he was not allowed to pick out his own items during the first compliance buy, (N.T. at 90), and the First Compliance Buy Report Form states that he purchased a one-pound bag of oranges for $2.00. (R.R. at 27a.) The hearing examiner noted that because the store clerk bagged the fruit for Utsey during the first compliance buy, Utsey "reasonably may have concluded, as the clerk bagged the fruit for him, that . . . four oranges (two dollars' worth at the Exhibit A-11 price of 2 for a $1.00) equaled one pound." (Department Adjudication at 19.) Because the hearing examiner weighed the evidence and determined Utsey's testimony regarding the orange purchase was more credible than Mr. Tounkara's testimony, we may not disturb the hearing examiner's finding on appeal.

Next, regarding Obimak's argument that the record does not contain any evidence as to whether Utsey purchased yellow or green plantains during the First Compliance Buy, it does not appear that Obimak presented any evidence at the hearing about the color or type of plantains sold. Because the First Compliance Buy Report Form shows that Utsey purchased a one-pound bag of plantains for $2.00, (R.R. at 27a), and Obimak did not present any contrary evidence at the hearing, it was not unreasonable or illogical for the hearing examiner to conclude that Utsey purchased a pound of plantains for $2.00.

Finally, regarding Obimak's argument that it has never sold 14.5-ounce boxes of cereal, the hearing examiner discredited the evidence Obimak presented at the hearing that it did not sell this cereal box size. The First Compliance Buy Report Form stated that Utsey attempted to purchase a 14.5-ounce box of Fruity Pebbles, but after he was informed that Fruity Pebbles are not a WIC authorized cereal, he

purchased two boxes of Honey Bunches of Oats instead. (R.R. at 26a.) Utsey also testified that he purchased two 14.5-ounce boxes of Honey Bunches of Oats. (N.T. at 90.)

The hearing examiner found Obimak's assertion that it has never sold 14.5-ounce boxes of cereal not credible for a number of reasons. First, the hearing examiner found Obimak not credible because, although Mr. Tounkara testified that Obimak had never sold 14.5-ounce boxes of Honey Bunches of Oats, (N.T. at 43-44), Obimak did not offer any evidence challenging Utsey's statement that he had attempted to purchase a 14.5-ounce box of Fruity Pebbles. Thus, the hearing examiner concluded it was uncontroverted that Obimak **did sell** 14.5-ounce boxes of Fruity Pebbles. (Department Adjudication at 20.) The hearing examiner also determined that Mr. Tounkara was not credible because, although he "asserted that he might have records indicating that [Obimak] only purchased 18-ounce or larger boxes of cereal for sale in the Store . . . he never produced such records or placed them into evidence, so there is no documentary support for his self-serving assertion." (Department Adjudication at 21 (citing N.T. at 44-45).) The hearing examiner clearly weighed the evidence and credibility of the witnesses regarding the size of cereal boxes sold by Obimak. Indeed, throughout her decision, the hearing examiner repeatedly concluded that the testimony presented by Obimak was not credible and that Mr. Tounkara was not a reliable witness. (Department Adjudication at 19-21, 24-25.) Because there is nothing to suggest that the hearing examiner's credibility determinations and weighing of the evidence were arbitrary or capricious, her findings of fact are conclusive on appeal.

The Department's regulations provide, in pertinent part, that "the Department will disqualify a WIC authorized store for [three] years for any of the

14

following violations: . . . [t]wo or more incidences of overcharges."[11] 28 Pa. Code §1107.1a(c)(3). As we have previously held regarding WIC program overcharges,

> the federal scheme mandates a three-year period of disqualification once the requisite number of overcharge violations has been detected. *See* 7 C.F.R. §246.12(l)(1)(iii)(C) (providing that State agency *must* disqualify a vendor for three years for a pattern of overcharges) (emphasis added). Although the Department's regulation is not expressed in such absolute language, it does not allow for a lesser sanction. *See* 28 Pa. Code §1107.1a(c)(3) (providing that the Department *will* disqualify a store for three years for two or more incidences of overcharges) (emphasis added).

*Diamond Mini Market v. Department of Health*, 79 A.3d 759, 765 (Pa. Cmwlth. 2013). Moreover, the circumstances surrounding an overcharge, such as an intent to overcharge or the amount overcharged,[12] are not considered when determining the sanction. *Id.* at 765-66; *Randy & Dayleen v. Department of Health* (Pa. Cmwlth. No. 1221 C.D. 2017, filed May 10, 2018), slip op. at 9.[13] In fact, in *Diamond Mini*

---

[11] As stated earlier, an overcharge is "[a] charge by a WIC authorized store to the WIC program through redemption of a WIC check for an allowable food in excess of the store's shelf price for that food or in excess of the price charged a non-WIC participant for that food." 28 Pa. Code §1101.2.

[12] We have previously noted that the amount of the overcharge is not considered because the WIC "[p]rogram is publicly funded and intended for the benefit of a nutritionally at-risk population; it is not designed or intended as an entitlement or revenue-enhancing program for retail vendors." *Diamond Mini Market*, 79 A.3d at 766. Further, "the cumulative effect of minor overcharges committed on a frequent basis could very well be profitable to the retailer, to the detriment of the [p]rogram and the WIC participant, whose check will buy less because she is being overcharged for allowable food." *Id.*

[13] Pursuant to this Court's Internal Operating Procedures, an unreported opinion of the Court filed after January 15, 2008, may be cited for its persuasive value. 210 Pa. Code §69.414(a).

*Market* we upheld the Department's decision to disqualify a store for three overcharges totaling only a nominal amount of 51 cents. 79 A.3d at 766.

Here, the First and Third Compliance Buy Reports, (R.R. at 24a-31a, 33a-40a), as well as testimony introduced at the hearing, (N.T. at 89-93, 111-121), provide substantial evidence that Obimak charged prices for WIC foods in excess of the store shelf prices on at least two occasions. Because the hearing examiner determined that Obimak engaged in two or more incidences of overcharges, under the Department's regulations it was required to disqualify Obimak from the WIC program for three years. *See* 28 Pa. Code §1107.1a(c)(3); *Diamond Mini Market*, 79 A.3d at 765-66; *Randy & Dayleen*, slip op. at 9.

## Conclusion

Accordingly, because the hearing examiner's order is supported by substantial evidence, it is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Obimak Enterprise,                :
         Petitioner          :
                            :   No.  1294 C.D. 2017
         v.                 :
                            :
Department of Health,       :
         Respondent     :

## ***ORDER***

AND NOW, this 6th day of December, 2018, the order of the Pennsylvania Department of Health, Division of Women, Infants, and Children, dated August 18, 2017, is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge