Nicholas Conner,      :
     Petitioner    :
             :
   v.        :
             :
Ram Forest Products, Inc.    :
and Todd Smith Logging, Inc.   :
(Workers' Compensation    :
Appeal Board),      :  No. 1064 C.D. 2021
     Respondents  :  Submitted: February 11, 2022

BEFORE: HONORABLE ANNE E. COVEY, Judge
     HONORABLE MICHAEL H. WOJCIK, Judge
     HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY          FILED: April 28, 2022

    Nicholas Conner (Claimant) petitions this Court for review of the Workers' Compensation (WC) Appeal Board's (Board) September 1, 2021 order affirming the WC Judge's (WCJ) decision that denied Claimant's Claim Petition for WC (Claim Petition). The sole issue before this Court is whether the Board erred by concluding that the WCJ's findings of fact and conclusions of law were supported by substantial evidence.[1] After review, this Court affirms.

---

[1] Claimant presents three issues in his Statement of Questions Involved: (1) whether the Board erred by finding that substantial evidence supported the WCJ's findings of fact and conclusions of law when the WCJ failed to analyze and weigh Ram Forest Products, Inc.'s (Ram) ability to exercise control over Claimant by way of paying for and sending him to training courses; (2) whether the Board erred by finding that substantial evidence supported the WCJ's findings of fact and conclusions of law when the WCJ disregarded basic common law agency principles in performing his analysis under *Hammermill Paper Co. v. Rust Engineering Co.*, 243 A.2d 389 (Pa. 1968), and concluded that Ram did not provide Claimant with tools or directly control his work; and (3) whether the Board erred by finding that substantial evidence supported the WCJ's findings of fact and conclusions of law that logging was not part of Ram's regular business. *See* Claimant

Ram Forest Products, Inc. (Ram) operates a high volume hardwood lumber sawmill in Shinglehouse, Pennsylvania. Claimant is a logger (i.e., cutter and skidder operator). On February 12, 2020, Claimant filed the Claim Petition against Ram seeking total disability WC benefits due to a "[l]eft segmental closed [] tibial fracture requiring surgical correction" that he sustained when a tree fell on his left leg while he was cutting timber in a forest owned by the Bradford City Water Authority on August 16, 2019.[2] Reproduced Record (R.R.) at 4a; *see also* R.R. at 5a-7a. On February 17, 2020, Ram opposed the Claim Petition, *inter alia*, denying that Ram was Claimant's employer on August 16, 2019, and asserting that he was an independent contractor.[3] *See* R.R. at 8a-10a, 29a.

The matter was assigned to a WCJ who conducted hearings on March 13, April 17, July 10, and August 21, 2020. On November 13, 2020, the WCJ held

Br. at 4-5. Because these issues are subsumed in this Court's analysis of whether the Board erred by concluding that the WCJ's findings of fact and conclusions of law were supported by substantial evidence, they have been combined and will be addressed accordingly herein.

[2] According to Claimant, on Friday, August 16, 2019, he was clearing land by himself on Ram's behalf for the Bradford City Water Authority when a tree fell and fractured his left leg. He called 9-1-1, and emergency medical personnel transported him to the Bradford Airport. Claimant was flown from the Bradford Airport to UPMC Hamot in Erie, Pennsylvania, where he underwent surgery. Claimant was released from UPMC Hamot on Sunday, August 18, 2019. He followed-up with the surgeon approximately three times, and then the surgeon released him from care on January 6, 2020. *See* Reproduced Record (R.R.) at 53a-64a.

[3] In its answer to the Claim Petition, Ram also asserted that Claimant was employed by Todd Smith Logging, Inc. (TSL) on the day he was injured. *See* R.R. at 8a-10a, 29a. Accordingly, Ram filed a Petition for Joinder of Additional Defendant (Joinder Petition), joining TSL to the litigation. *See* R.R. at 11a-12a. TSL and its insurer, Allied Eastern Indemnity Company (Allied), filed answers to the Claim Petition denying Claimant's allegations, and Allied further asserted it did not insure TSL on August 16, 2019. *See* R.R. at 13a-20a. At the March 13, 2020 hearing, Ram's counsel requested the WCJ to bifurcate the case to address, first, whether Ram or TSL employed Claimant or whether he was an independent contractor and, second, whether Allied insured TSL on August 16, 2019. *See* R.R. at 21a-39a. Following the March 13, 2020 hearing, the WCJ bifurcated the matter. However, on September 25, 2020, after Claimant's counsel informed TSL that Claimant did not contend that TSL was his employer on August 16, 2019, Ram withdrew the Joinder Petition. In a September 29, 2020 decision, the WCJ dismissed the Joinder Petition as having been withdrawn. Thereafter, neither Allied nor TSL participated in these proceedings.

that Claimant failed to establish he was Ram's employee when he was injured on August 16, 2019. Claimant appealed to the Board. On September 1, 2021, the Board affirmed the WCJ's decision. Claimant appealed to this Court.[4]

> Initially,
>
> > in a claim proceeding, the claimant bears the burden of proving all elements necessary for an award, including the existence of an employer-employee relationship. *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, . . . 762 A.2d 328 ([Pa.] 2000); *Staron v. Workers' Comp. Appeal Bd. (Farrier)*, 121 A.3d 564 (Pa. Cmwlth. 2015). A claimant's employment status is a critical threshold determination for liability under the [WC] Act [(Act)[5]]. *Universal Am-Can*. This is because independent contractors cannot recover benefits under the Act. *Cox v. Caeti*, . . . 279 A.2d 756 ([Pa.] 1971).

*Edwards v. Workers' Comp. Appeal Bd. (Epicure Home Care, Inc.)*, 134 A.3d 1156, 1162 (Pa. Cmwlth. 2016).

> > Section 104 of the [] Act defines an employee to be "synonymous with servant, and includes - [a]ll natural persons who perform services for another for a valuable consideration, exclusive of . . . persons whose employment is casual in character and not in the regular course of the business of the employer . . . ." 77 P.S. § 22. There is no bright line rule for determining whether a particular relationship is that of an employer-employee or owner-independent contractor. *Universal Am-Can*. Nevertheless, our Supreme Court has established the following factors that must be considered when making such determination:
> >
> > > Control of manner work is to be done; responsibility for result only; terms of agreement

---

[4] "Our review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated." *Pierson v. Workers' Comp. Appeal Bd. (Consol Pa. Coal Co. LLC)*, 252 A.3d 1169, 1172 n.3 (Pa. Cmwlth.), *appeal denied*, 261 A.3d 378 (Pa. 2021).

[5] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

3

between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer[;] and also the right to terminate the employment at any time.

*Id*. at 333 (quotation marks and citations omitted) (quoting *Hammermill Paper Co*[.] *v. Rust Eng*[*'g*] *Co*[.], . . . 243 A.2d 389, 392 ([Pa.] 1968). "Whether some or all of these factors exist in any given situation is not controlling." [*Universal Am-Can*, 762 A.2d at 333]. Although each factor is relevant, "control over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status." *Id*. "Moreover, it is the existence of the *right* to control that is significant, irrespective of whether the control is actually exercised." *Id*. (emphasis in original).

*Dep't of Lab. & Indus. v. Workers' Comp. Appeal Bd. (Lin & E. Taste)*, 155 A.3d 103, 110 (Pa. Cmwlth. 2017), *aff'd*, 187 A.3d 914 (Pa. 2018). "The existence of an employer-employee relationship is a question of law based on the facts presented in each case."[6] *Edwards*, 134 A.3d at 1162.

Moreover, the law is well established:

The WCJ is the fact[-]finder, and it is solely for the WCJ . . . to assess credibility and to resolve conflicts in the evidence. Neither the Board nor this Court may reweigh the evidence or the WCJ's credibility determinations.[7] In

---

[6] "Because the determination as to the existence of an employer[-]employee relationship is a question of law, on this issue, our scope of review is plenary and our standard of review is *de novo*." *Lin*, 155 A.3d at 109.

[7] Specifically, "Section 422(a) [of the Act, 77 P.S. § 834,] does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations. [Thus, u]nless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal."[FN]16 *Pa. Uninsured Emp*[*s.*] *Guar. Fund v. Workers' Comp. Appeal Bd. (Lyle)*, 91 A.3d 297, 303 (Pa. Cmwlth. 2014)

4

addition, it is solely for the WCJ, as the fact[-]finder, to determine what weight to give to any evidence. . . . As such, the WCJ may reject the testimony of any witness in whole or in part, even if that testimony is uncontradicted.

*W. Penn Allegheny Health Sys. v. Workers' Comp. Appeal Bd. (Cochenour)*, 251 A.3d 467, 475 (Pa. Cmwlth. 2021) (quoting *Hawbaker v. Workers' Comp. Appeal Bd. (Kriner's Quality Roofing Servs.)*, 159 A.3d 61, 69 (Pa. Cmwlth. 2017) (internal citations, quotations, and brackets omitted)).

Here, Claimant argues that the Board erred by finding substantial evidence supported the WCJ's findings of fact and conclusion that Claimant was not Ram's employee when Claimant was injured. Specifically, Claimant contends that the Board and the WCJ erred by concluding that logging was not part of Ram's regular business, by disregarding basic common law agency principles under *Hammermill Paper Co.*, and Claimant's evidence that Ram controlled his work, Ram paid for him to attend logger training courses, and Ram provided his tools.

Claimant testified that he worked as a logger for Todd Smith Logging, Inc. (TSL) from approximately 2013 to 2016 or 2017,[8] cutting trees and operating a

---

(quoting *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 195 (Pa. Cmwlth. 2006)).

[FN]16 Capricious disregard "occurs only when the fact-finder deliberately ignores relevant, competent evidence." *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 145 (Pa. Cmwlth. 2004). Capricious disregard, by definition, does not exist where, as here, the WCJ expressly considered and rejected the evidence. *Id.*

*Kimberly Clark Corp. v. Workers' Comp. Appeal Bd. (Bromley)*, 161 A.3d 446, 462 (Pa. Cmwlth. 2017).

[8] Claimant stated that TSL trained him in how to cut trees. *See* R.R. at 147a. Claimant explained that, although he used his own chainsaw, TSL lined up his jobs, TSL carried WC insurance, and TSL paid him. *See* R.R. at 118a-119a, 121a. He admitted that TSL considered him an independent contractor and he received Internal Revenue Service 1099-Misc forms from TSL. *See* R.R. at 152a-153a.

5

log skidder.[9]  *See* R.R. at 117a-118a, 151a-152a.  Claimant explained that TSL's logging jobs were obtained "through Ram."  R.R. at 119a.  Claimant recalled that, after expressing to TSL's owner, Todd Smith (Smith), that he wanted to go out on his own, Smith told him he should "get[] in with Ram," R.R. at 118a, and "[Smith] got [Claimant] into Ram[.]" R.R. at 119a.  Claimant later expressed that Smith asked Claimant if he wished to work for Ram, because TSL was going to cancel TSL's WC insurance.  *See* R.R. at 151a.

Claimant declared at the WCJ hearings that Ram had employed him as a logger for approximately three years at the time of his August 16, 2019 injury.  *See* R.R. at 54a-55a, 124a-125a.  Claimant stated that, although he did not interview with Ram or sign a contract, he worked steadily and full-time for Ram and no other companies during that time.[10]  *See* R.R. at 55a, 121a, 124a, 126a, 135a-137a, 149a.  He explained that the only downtime between jobs occurred due to weather, or the need to clean the equipment between forest service jobs.  *See* R.R. at 125a.  Claimant expressed that he could reject Ram jobs, but then he would not be working.  *See* R.R. at 125a.

Claimant described that he would contact one of Ram's foresters, often Brian Fox (Fox), to find out what cut and skid jobs Ram had available.[11]  *See* R.R. at 120a-121a, 125a, 164a-165a.  He stated that, when he arrived at a job, a Ram forester had already marked the skidder paths, the trees to be cut, and the landing

---

[9] A skidder is a vehicle used to pull cut trees out of a forest to a staging area where they are cut into logs, and a logging truck picks up the logs and transports them to the mill.  *See* R.R. at 122a-124a, 129a, 314a.

[10] Claimant expressed that he never worked on any jobsites at which TSL and Ram were not involved.  *See* R.R. at 147a, 149a.  All of his TSL jobs were conducted for Ram.  *See* R.R. at 149a-150a.

[11] Once Claimant began obtaining Ram jobs on his own, TSL no longer informed him about Ram jobs.  *See* R.R. at 155a.

6

zone where the trees were to be cut into logs and loaded onto the trucks.[12] *See* R.R. at 128a-130a, 132a-133a. Ram did not train Claimant, but prescribed that stumps were to be no taller than one foot, and he could not block open trails. *See* R.R. at 132a-134a, 138a-139a. Claimant clarified that he paid for and used his own chainsaw and other tools, and used TSL's skidder and logging truck[13] for Ram's jobs, and that Ram did not prescribe the days or hours during which work had to be performed.[14] *See* R.R. at 119a, 123a-124a, 140a-141a, 146a-147a, 161a. He testified that Ram's forester would specify the log lengths and would check jobs and order corrections where necessary, but did not prescribe how Claimant was to do the work. *See* R.R. at 124a, 132a-133a, 139a, 141a-143a.

Claimant testified that Ram paid him $30.00 for each 1,000 feet of lumber he cut. *See* R.R. at 130a-131a, 144a-145a. Ram calculated how much money Claimant was owed for each job, and Ram paid him with Ram checks signed by Ram's owner, Bob Mallery (Mallery). *See* R.R. at 119a-121a. Claimant described that his fellow logger Jim Berlin's (Berlin) wife would pick up their paychecks from Ram's office. *See* R.R. at 127a-128a, 146a. Claimant admitted that Ram did not provide health insurance for him, that he did not execute any proof of citizenship or tax withholding forms for Ram, and that Ram provided him with Internal Revenue Service (IRS) 1099-Misc forms (1099 Form). *See* R.R. at 143a-144a, 154a, 546a-547a.

Ram's chief financial officer Paul Westerburg (Westerburg) testified that Ram has 85 employees and that all of Ram's employees complete local earned income tax resident certification forms, citizenship forms, and smoking policy, cell

---

[12] Claimant admitted there were times that he had to cut access paths to the cutting zones, and/or divert water, but that was unpaid work. *See* R.R. at 131a, 162a-163a.

[13] Claimant stated that Ram paid TSL for use of the skidder, and he assumed Ram paid TSL to use the logging truck. *See* R.R. at 123a-124a, 155a-156a, 161a-162a.

[14] Ram did provide deadlines by which each job had to be completed. *See* R.R. at 140a.

phone policy, and emergency contact forms. *See* R.R. at 174a-176a. He confirmed that Ram has no such forms completed by Claimant. *See* R.R. at 176a. Westerburg explained that Ram paid Claimant because, at some point, Smith had "requested . . . that [Ram] start paying [Smith] and his two contractors . . . [] Berlin and [Claimant], . . . separately. And [Ram] agreed to do that." R.R. at 180a; *see also* R.R. at 206a-207a. He described that, beginning in November 2017, Ram paid Claimant based on Ram's scalers' determinations based on log volume. *See* R.R. at 208a-210a, 213a, 217a. Westerburg added that Ram had an IRS W-9 form which Claimant completed in November 2017, on which Claimant designated that he was an "Individual/sole proprietor, or single-member LLC," R.R. at 460a, and Ram issued 1099 Forms to Claimant in 2017, 2018, and 2019, like it did for all of its logging contractors. *See* R.R. at 180a, 223a, 546a-547a. Ram's 2017, 2018, and 2019 1099 Forms reflected that Ram paid Claimant "nonemployee compensation."[15] R.R. at 546a-547a.

Westerburg confirmed that he never met Claimant, and that Ram did not interview or hire Claimant, train him, instruct him on any job, or supply his tools; rather, all communication was through TSL. *See* R.R. at 178a-180a, 198a. Westerburg described that, if Ram had concerns with Claimant's work, it would have raised them to Smith. *See* R.R. at 205a.

Westerburg stated that Ram entered into the contract for the Bradford City Water Authority job, but none of Ram's employees were on site at that job. *See* R.R. at 176a, 186a, 200a. He described that the skidder and logging truck used at the Bradford City Water Authority job belonged to TSL. *See* R.R. at 195a-196a, 211a-212a. He explained that Ram paid $160.00 per 1,000 feet of timber cut and

---

[15] *See also* Claimant's 2017, 2018, and 2019 Individual Tax Returns. *See* R.R. at 551a-640a.

skidded: $95.00 to TSL, $35.00 to Berlin, and $30.00 to Claimant.[16] *See* R.R. at 226a-227a, 229a-234a, 378a-380a. Westerburg declared that Ram did not provide any insurance benefits to Claimant, and Claimant was not among the employees covered by Ram's WC insurance. *See* R.R. at 179a-180a. Westerburg testified that, since Claimant's accident, Ram made sure it obtained signed independent contractor agreements from each of its logging contractors. *See* R.R. at 207a, 213a-215a.

Smith testified that he began logging for Ram as an independent contractor in approximately 2006, and has logged for Ram since that time. *See* R.R. at 332a. Smith represented that it is standard in the industry for loggers to be independent contractors, and TSL never had employees, and Claimant was never on TSL's payroll. *See* R.R. at 349a, 354a-355a, 378a. Smith described that, over the years, he acquired skidders, bulldozers, and a logging truck, and paid independent loggers to be on his crews. *See* R.R. at 332a-333a. Smith asserted that the loggers on TSL's crews, including Claimant, were independent contractors to whom TSL issued 1099 Forms until 2018. *See* R.R. at 333a, 355a-356a, 382a-384a. Smith reported that Claimant supplied and used his own chainsaw and personal protective equipment and, although he occasionally used a skidder, he was primarily a cutter. *See* R.R. at 357a-358a, 394a-395a.

Smith explained that, since logging is a very dangerous job, he carried WC insurance for the independent contractors, initially under Nortim and then later under Allied Eastern Indemnity Company. *See* R.R. at 333a-334a. However, at some point, after Smith discovered that Amish loggers outbid TSL for jobs because the Amish did not carry WC insurance, Smith met with Ram foresters to discuss the prohibitively expensive WC insurance rates (compared to what they are paid) and,

---

[16] That rate did not include hauling the logs to the mill, for which Ram paid Smith separately. *See* R.R. at 339a, 379a.

ultimately, Ram agreed to increase the rate it paid TSL. *See* R.R. at 333a-336a, 349a, 351a. Smith added:

> But then the rate went back down and at that point I just basically couldn't do any more. Threw my hands up. Said I don't want to be exposed to that anymore. And I - I was prepared to shut everything down but the [logging] truck, but [] Berlin wanted to continue on. So that's why he wanted to - to keep logging as an independent contractor for Ram directly I guess.

R.R. at 336a.

Smith recounted that, during an impromptu talk with Mallery at Ram's mill in approximately May 2018, Mallery stated that Ram would pay the men on TSL's logging crew - Berlin and Claimant - directly. *See* R.R. at 336a-337a. Thereafter, TSL's WC insurance was cancelled and Smith worked on his own, primarily trucking logs, while Berlin rented the skidder from Smith and obtained jobs directly from Ram. *See* R.R. at 337a-340a, 361a-364a, 369a, 385a-391a, 445a, 473a-480a, 496a. Smith acknowledged that, although it may have appeared that he, Berlin, and Claimant were still working together under TSL because they were often at the same job sites together, that was not the case. *See* R.R. at 340a-341a. Smith claimed that he did not negotiate the $160.00 per 1,000 foot board rate with Ram, stating that it must have been Berlin, since Smith was only concerned about the $95.00 Berlin would pay him for the skidder rental. *See* R.R. at 376a, 379a-380a.

Smith declared that, as of August 2019, Claimant had worked with TSL as an independent contractor for several years and, until May 2018, TSL provided Claimant WC insurance coverage. *See* R.R. at 342a-345a. He recalled that Claimant received logger training at State of Forestry Initiative (SFI) classes that TSL initially paid for, but Ram eventually reimbursed TSL for Claimant's training. *See* R.R. at 356a-357a. Smith offered that, at the time of Claimant's accident, Claimant was primarily a cutter and Berlin operated the skidder. *See* R.R. at 346a-347a.

10

Although Smith could not recall how he found out about the Bradford City Water Authority job, he believes that Berlin informed Claimant about it. *See* R.R. at 360a, 376a-377a. Smith specifically declared that TSL did not employ, supply tools to, or control Claimant's work in 2019. *See* R.R. at 381a-384a, 392a-393a.

Mallery testified that he has been Ram's president and owner since 1977. *See* R.R. at 311a. Mallery reported that Ram does not employ loggers, or any other employees who cut and skid trees. *See* R.R. at 314a-315a, 319a, 325a-327a. Instead, Ram contracts that work to logging companies, all of whom are independent contractors, which has always been standard in the industry. *See* R.R. at 316a-317a, 319a-320a, 324a. Mallery further declared that he does not get involved with logger rate negotiations; instead, that is up to Ram's foresters. *See* R.R. at 323a-324a.

Fox testified that he is one of Ram's six procurement foresters who are responsible for purchasing standing timber and administrating logging contractors, and declared that all logging contractors are independent contractors. *See* R.R. at 258a, 276a, 278a, 295a. Fox asserted that he never interviewed or hired Claimant to work for Ram, nor was Claimant ever a Ram employee or an independent contractor hired by Ram; rather, he understood Claimant to be an employee or subcontractor working under TSL for Ram, including at the Bradford City Water Authority job. *See* R.R. at 258a-259a, 261a, 277a-278a, 298a, 300a-301a.

Fox recalled that Ram encouraged at least one person on every logger contractor crew to attend SFI program training, for which Ram initially reimbursed the contractors. *See* R.R. at 289a-290a. Fox expressed that TSL has logged for Ram since approximately 2006. *See* R.R. at 286a-287a. Fox declared that Ram did not dictate TSL's schedule nor supply the tools or equipment necessary to do any job.[17]

_____

[17] Fox testified that, at most, Ram provided logging contractors with spill kits to be used in cases of fuel or liquid spills or leakages. *See* R.R. at 269a.

11

*See* R.R. at 269a-271a, 297a. Fox stated that, aside from specifying how the logs should be cut for market conditions and visiting job sites to check site conditions, Ram did not direct TSL or Claimant as to how the logging work should be done. *See* R.R. at 272a, 279a-282a, 295a-296a. Fox added that, if there were issues with logging work at the sites (excessive mud, damaged soil or trees, etc.), he would discuss them with Smith. *See* R.R. at 279a, 282a-283a.

Based on the record evidence, the WCJ made the following relevant findings of fact:

> After carefully considering the evidence presented by both parties, there appears to be no evidence that Ram controlled the manner in which [Claimant] performed his logging duties. There is no evidence to establish that Ram informed [Claimant] directly what needed to be done, nor did Ram direct [Claimant] as to how the work was to be performed. During his testimony, [Claimant] acknowledged that no one from Ram called him and informed him that Ram wanted him to do any particular job. To the contrary, he testified that information regarding a particular job would be relayed to him by [] Smith. [Claimant] acknowledged that Ram did not tell him when to start a particular job on a particular day, nor did Ram direct him to stop working at the end of a particular day. [Claimant] further acknowledged that he never received any type of training from Ram. As the representatives from Ram testified, they had no direct relationship with [Claimant].
>
> . . . .
>
> This [WCJ] further notes that there appears to be no evidence of record indicating that there was any type of employment agreement between the parties. As [Claimant] acknowledged, he never interviewed for a job position with Ram. Furthermore, [Claimant] acknowledged that Ram did not provide him with health insurance, he did not complete any tax forms or any withholding forms, and specifically testified that he never filled out anything for Ram.

12

Based upon the evidence of record, this [WCJ] further finds that Ram never provided any type of training for [Claimant], and never paid for training that [Claimant] received from another source. As [Claimant] testified, when he was employed through [TSL], he was provided training as to how to cut down a tree. [] Westerburg testified that Ram did not provide training to [Claimant], further explaining that Ram subcontracts the cutting of trees to independent contractors because Ram does not have the experience.

Regarding the issue of who supplied the tools necessary to perform the job, the evidence of record indicates that two of the most critical tools in the logging business are a chainsaw and a skidder. [Claimant] acknowledged that Ram did not provide him with a chainsaw or any other tools. To the contrary, [Claimant] acknowledged that the saws were his own, and the skidder was [TSL's].

The evidence of record further indicates that the tax forms completed by [Claimant] revealed his status as an independent contractor. [Claimant] completed a W-9 form, acknowledging that he was a sole proprietor and not an employee. Furthermore, Ram issued 1099[] [Forms] in 2017, 2018[,] and 2019 indicating that it considered [Claimant] as an independent contractor and not an employee. [Claimant] completed tax forms in 2017, 2018[,] and 2019, noting his self-employment as a logger. Furthermore, there is no dispute that [Claimant] was not paid based on his hours of work, or at a weekly rate, but instead was paid on the basis of his production. [Claimant] was paid $35.00 [sic] per [1,000] feet of timber, which he produced for [Ram]. [Claimant] further acknowledged that he was free to reject jobs that were provided by Ram.

Finally, this [WCJ] notes that the evidence of record indicates that logging was not part of the regular business of Ram. During the proceedings, [] Westerburg and [] Mallery explained that Ram is a high volume hardware lumbar sawmill which does not employ any loggers. While it is obvious that Ram, as a sawmill, needs lumber, it was not part of [its] regular business to perform the logging work. To the contrary, Ram hired independent contractors to perform the logging.

13

> To the extent that . . . [Claimant] testified in support of his assertion that he was an employee of Ram at the time of his injury, this [WCJ] does not find [Claimant's] testimony to be credible or persuasive.
>
> To the contrary, this [WCJ] accepts as more credible and persuasive the testimony of [Ram's] witnesses, [] Westerburg, [] Fox and [] Mallery, that [Claimant] was an independent contractor, and not an employee of Ram, at the time of his injury. Not only has [Claimant] failed to prove the existence of an employer/employee relationship between Ram and himself, but the evidence of record provides clear and convincing evidence that, per the standard in the industry, [Claimant] was an independent contractor at the time of his injury.

WCJ Dec. at 8-11. The WCJ concluded: "Based upon the foregoing Findings of Fact, it is concluded as a matter of law that [Claimant] has failed to sustain his burden of proving that he was an employee of [Ram], rather than an independent contractor, at the time of his August 16, 2019 injury." WCJ Dec. at 11.

> "For purposes of appellate review, it is irrelevant whether there is evidence to support contrary findings; if substantial evidence supports the [fact-finder]'s necessary findings, those findings will not be disturbed on appeal."[18] *Verizon* [*Pa.*] *Inc. v. Workers' Comp*[.] *Appeal* [*Bd.*] *(Mills)*, 116 A.3d 1157, 1162 (Pa. Cmwlth. 2015). When "performing a substantial evidence analysis, this Court must view the evidence in a light most favorable to the party who prevailed before the fact-finder." *WAWA v. Workers' Comp*[.] *Appeal* [*Bd.*] *(Seltzer)*, 951 A.2d 405, 408 (Pa. Cmwlth. 2008). Further, when determining whether substantial evidence exists to support a finding of fact, this Court must give to the party in whose favor the appealed decision was decided "the benefit of all inferences that can logically and reasonably be drawn from the evidence." *B.J.K. v. Dep*[*'t*] *of Pub*[.] *Welfare*, 773 A.2d 1271, 1276 (Pa. Cmwlth. 2001).

---

[18] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Obimak Enter. v. Dep't of Health*, 200 A.3d 119, 126 (Pa. Cmwlth. 2018) (quoting *B.B. Kim's Mkt., Inc. v. Dep't of Health, Div. of Women, Infants & Child. (WIC)*, 762 A.2d 1134, 1135 (Pa. Cmwlth. 2000)).

14

*Obimak Enter. v. Dep't of Health*, 200 A.3d 119, 126 (Pa. Cmwlth. 2018).

Since this Court may not reweigh the evidence or the WCJ's credibility determinations, and because the record evidence supports the WCJ's findings of fact and conclusions of law,[19] this Court holds that the Board properly affirmed the WCJ's determination.

Based on the foregoing, the Board's order is affirmed.

_____
ANNE E. COVEY, Judge

---

[19] The WCJ's finding that Ram "never paid for training that [Claimant] received from another source[,]" WCJ Dec. at 10, is contrary to Fox's statement that Ram would reimburse loggers for the SFI training, *see* R.R. at 289a-290a, and Smith's testimony that Claimant underwent SFI training for which TSL initially paid, and Ram reimbursed TSL. *See* R.R. at 356a-357a; *see also* Board Op. at 8 n.1. Notwithstanding, in light of the other evidence, this was a *de minimis* error.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Nicholas Conner,                          :
             Petitioner       :
                           :
             v.             :
                           :
Ram Forest Products, Inc.                 :
and Todd Smith Logging, Inc.              :
(Workers' Compensation                    :
Appeal Board),                            :   No. 1064 C.D. 2021
             Respondents      :

## O R D E R

AND NOW, this 28th day of April, 2022, the Workers' Compensation Appeal Board's September 1, 2021 order is affirmed.

_____
ANNE E. COVEY, Judge